Good morning. May it please the Court, Mr. Pagny. I'm Shawn McCray representing Mr. Savath. We have two issues in this case. One is the surge or the stop issue, and the second, if the Court were to rule against me on that, would be the issue of the denial of the motion for judgment of acquittal on the 924C count. I'm hoping the Court's going to ask me a lot of questions, and I'm hoping to reserve a couple of minutes for rebuttal. That's all what you wish for. Okay. I'm ready. Oh, I was waiting for the question. Okay. The defense position is, and I submit that it's not disputed, is the stop of Mr. Savath's vehicle was not a traffic stop. The intention of Detective Rapéh in having Officer Bishop stop the car was to execute the arrest warrant for the passenger Brian Jump, and the government agrees with that on page 124 of their supplemental excerpt of record. The reason for executing the arrest warrant at the time of the stop, or making the stop, as opposed to arresting Mr. Jump at his residence, was because Detective Rapéh did not want to arrest him at the home in front of his children, and the government makes that point at page 17 of their brief. But because we do not have a traffic stop, we have a situation where the only basis for the detention of the vehicle and its occupants was to arrest Mr. Jump, the passenger. That happened very, very quickly. He was taken out of the car, he was taken to the other patrol car, and it is our position at that point, we're done. The government now contends, although they didn't raise it to the district court, that there was reasonable suspicion for a Terry stop because allegedly now they contend that Mr. Savath, the defendant, was attempting to hinder prosecution by transporting Mr. Jump. This is not supported by any facts or evidence in the record. What about Boone? I'm sorry? What about Boone? Boone. Boone, who admitted, oh, that the group was on the way to buy some meth. But that comes after the fact. At that point, Mr. Savath has been arrested and taken away. And the whole issue is, what did Detective Rapéh know at the time that his probable cause for the arrest of Mr. Jump is over? Well, okay, so he arrests Mr. Jump because they're looking for Mr. Jump. They have the evidence or the information about Mr. Jump. With respect to your client, was there anything illegal about asking him for his name and identification? Yes. That's illegal? It is in this context. I thought it's illegal, but he doesn't have to give it. Well, I mean, it's legal, but he doesn't have to give it. That would be true if this were an encounter. But this was not an encounter. I would agree with Your Honor, if at the point Mr. Jump was taken away, Detective Rapéh had told Officer Bishop to turn off the overhead lights, that they had told Mr. Savath that he was now free to leave, then I agree. Detective Rapéh could have asked Mr. Savath anything he wanted to. So is it your position, my understanding is that Jump had an outstanding warrant, right? Arguably, yes, although it is a little troubling if you look at – You know, all of your argument leading up to here was this whole thing was about arresting Jump, and once Jump was arrested, schools out, no further law enforcement activity. Correct. So in your opinion, it was improper for the police to run a computer check on Mr. Savath? Yes. And discover that he also had an outstanding warrant? That's right. And what is the strongest case for that? Which is the same question. Why? The question is, what's the basis for – why is that? And we're saying, what's the strongest case to support your position? Because – well, it's more the flip side, Your Honor. When you read all of the cases, when they talk about – let's take Turbin, for example. When they talk about extending a stop, it is always in the context of the stop being a traffic stop. So, for example, in Turbin, we have excessive exhaust, we have skidding around the corner, we have traveling six miles over the speed limit in snowy conditions. May I ask you a question? Was Jump wanted on a felony warrant? Yes, he was wanted. He was wanted on a felony warrant, which means that he was a suspected felon. He was a felon. He was being transported in a car driven by Savath, true? Yes. Does that not give the officer some inkling that perhaps Savath is helping Jump escape? No, Your Honor, because under Oregon Revised Statute 162.325, it is different than the federal statute, 18 U.S.C. Section 3, in the sense that the individual here, Mr. Savath, need not know about the underlying case. In other words, about Mr. Jump's felony conviction for forgery, which is what the warrant was based on. Let's go back to Savath. Here's my understanding of the sequence. You tell me if I'm wrong. Okay. They know Jump's in the car. They know they have a warrant for Jump. They see Jump get in the car and drive off. They radio another patrol car. That car pulls the Savath vehicle over. Jump is identified and arrested. Am I right so far? Yes. And then Savath is asked for his driver's license. Yes. And he says he doesn't have one. He responds to the officer's question. He doesn't have one. That's correct. So then they ask him for some form of identification. Yes. And he gives them something which correctly identifies his name. True. And at that point, the officers run a computer check. Right. And you say that's bad. I do.  Because the only basis that the officers had to detain Mr. Savath was to arrest Mr. Jump. No, no, no, no, no. They've got a guy driving a car. The car is pulled over. He's told the officers he has no driver's license. That means law enforcement can't determine if his license has been suspended, revoked, or otherwise impaired, or there might be other warrants out for him? That's correct. They cannot do that. You're saying they can't even ask him if he has for his license? Not once Mr. Jump has been arrested and taken out of the car. So I thought that the general rule was that, you know, they can always make a request, stop somebody briefly, ask them for identification, and they don't have to comply. But if you have somebody who's driving a car with a felon who's now being arrested on a felony warrant, the position you're taking is you can't even ask the driver of the car, may I have your driver's license, please? They might be able to ask him if they had done it before they arrested Mr. Jump and took him away. Now, what would be the difference? Because the only basis, the only basis they had to stop the vehicle, and they created that basis, was to arrest Mr. Jump. If they had seen a failure to make a left-hand turn, it would be a whole different situation. No, but let's just stop here. You're saying if they stop the car, they know they have the warrant on Mr. Jump. Right. And they say to Mr. Savath, sir, may I have your driver's license, please? That would have been okay. That might have been okay. I thought you said it would be okay. Well, I don't really care because it's not my case. Well, it might be your case because you're saying that they could have said, Mr. Savath, I'd like your driver's license, please. And then he could turn it over and he'd say, well, I don't have one. Then they'd say, well, you don't have a driver's license, you're driving the car, what's your name? And then they would do the warrant search. And the only difference you're saying is that because they arrested Mr. Jump first and took care of him who's out on a felony warrant, they took care of him and secured his situation before they asked Mr. Savath. That puts us into constitutional violation territory. Is that your position? Okay. That is my position because they didn't have reasonable suspicion that there was hindering going on under the Oregon statute. Clearly, the U.S. federal statute doesn't apply because a person must know about the offense against the United States. We don't have that here. I'm finally getting back to your question, Your Honor. Under ORS 162.325, Mr. Savath need not know about the underlying case, but he still must act to aid the perpetrator in escaping justice. We have no objective facts or indication of that. And under either the federal statute or the state statute, it must be specific. Are you saying that the police officer knew that they were on a meth buy rather than escaping justice? He didn't know anything. As much as he knew is that they had gotten into the car, and that is not enough. He didn't know where they were going. They might be going to Alaska. Well, they might be going to Alaska. They might be going down to the grocery store. But under Terry, Your Honor, he's got to have reasonable suspicion of particularized and objective basis for suspecting the person stopped of criminal activity. He didn't have that here under either statute. There was nothing to indicate specific intent to frustrate law enforcement. It just isn't there. What you're saying is that a driver of an automobile who has a felon in his car cannot be suspected of attempting to put the felon beyond the law's reach. No, I'm not saying that. I'm saying that there has to be something more. For example, in the Lopez case at the government sites, we had an issue with the getaway car. We also had an issue of the person who had pointed a firearm at people, and now this person shows up to get the car. And so that was a totally different situation than this one. What we know from our circumstances is all that Detective Rapéh did was decided to execute the warrant away from Mr. Jump's children and to arrest him in the car, not that he made any claim at any time or formed any opinion that Mr. Savath was attempting to hinder prosecution or to aid or assist Mr. Jump unlawfully. The officers in the vehicle that actually stopped the Savath vehicle, did they know Jump? I don't know. My belief from the record would be no, because Detective Rapéh radioed Officer Bishop and told him to stop the car. Then if the officers in the second vehicle do not know who Jump is, what's wrong with asking the driver for identification? Well, that would be a different issue. But Officer Bishop did not ask the driver for identification. You're not answering my question. What's wrong with trying to find out who's on first? Because the only basis, the only lawful basis for this stop is to arrest Mr. Jump. The authorities have no other legal basis to invade or detain Mr. Savath. I think you've told us that about nine times, but my question is this, if the officers in the second vehicle did not know who Jump was, there were two men and a woman in the vehicle? Correct. But they knew Jump was a man. Will you concede that? Of course I'll concede that, and I'm not even sure that Officer Bishop knew why he was stopping the vehicle. Stopped the vehicle, there's a guy with an outstanding warrant in the vehicle, and you're telling me even if the record tells us that the officers in the second vehicle didn't know which of the two men Jump was, it was improper to ask the driver for identification? Yes. That's your position? That's my position. Okay. That's my position because this was such a limited. That's your story and you're sticking to it. It was such a limited basis for the stop, and it's so different from every other case that we've had. Let me just say very, very briefly on the 924C count. If you look at the excerpt of record at page 69, it sets out the overt acts for count two, which is the conspiracy count. Count three is a 924C count. Looking at those, looking at the evidence, there was nothing to indicate the necessary specific nexus of the firearm to the agreement, the conspiracy, which was completed by telephone. The overt acts aren't necessary under Shabani, and the motion for judgment of acquittal should have been granted. I'd like to reserve the rest of my time for rebuttal if I may. You may. Thank you. We'll hear from the government. Good morning. My name is Frank Papagni. I'm the prosecutor responsible for this case. Ms. McRae and I have gone through the suppression issues. The issue regarding the outstanding warrant in my first response to the first motion to suppress, Ms. McRae filed the second one. On supplementary excerpt record, page 16, I attached to my motion to suppress response a copy of the warrant, so there was an outstanding warrant for Mr. Jones. What's going on in this case, which I think causes Ms. McRae's argument to fail or certainly weakens it substantially, is the totality of what we're looking at here. What we have is a detective who's basically on a stakeout. He's staking out the home of a woman who has a restraining order against Mr. Jones, also has his children. While he's watching this home, seeing for Mr. Jones, so he can arrest him, this little red car pulls up, which contains Ms. McRae's client. The car stays there for a while. The car is washed. The detective is waiting, sees Jump come out. Now, he knows Jump. That's who he's waiting for. That's what the surveillance is about. He doesn't know this other guy. And all of a sudden, the other guy waits for the red car, and then this woman shows up. And they all stay out near the car for just a few moments. And they all get in the car, and they start to drive away. The detective recognizes Jump. Experienced detective. Know there's a warrant. Know he's authorized to make a stop. Warrant, public place. Pull the car over. Let's arrest him. Does it the right way. Gets some backup. The officer driving the patrol car, Officer Bishop, he didn't know who was in the car. But he had been asked for assistance to effectuate an arrest. You know he knows that, not only from what is logical, but the position he takes that the record shows at the motion suppress hearing. He takes up a cover position. He stands on the driver's side. Why do we know the detective knows it's Jump? He immediately goes to the passenger side. The objective is to stop. The objective of what he's doing is to get Jump out of the car and arrest him. He does. When he arrests Jump, he finds a dagger. At that point, Jump's taken into custody, handcuffed, put in the car, taken away. At this point, which makes it constitutionally permissible, is the brevity of the stop and the purpose of the question that the detective asks. Ms. McRae's case would be much stronger if the detective had kept Mr. Savatt there for a long time. But we know from the record, which I've established for you in my excerpt, as well as in my brief, that we're talking about 24 to 25 minutes, totality of everything. So your description to this point, it sounds like the line of questioning that I had for Ms. McRae at the end, when the vehicle comes to arrest, both the detective and the backup officer are there. Correct. And the detective knows who Jump is. Correct. And Jump's arrested before Savatt is asked for ID. Correct. Okay. And at that point, once Jump is arrested, the detective then turns his attention to the driver of the car. Okay. And this really is the dividing point, and the only dividing point, it appears, according to Ms. McRae, which is she says at that point, game over. Mr. Jump should go away, of course, and be arrested. He's already been arrested and secured. There's no reason to ask any questions. There's no Terry basis. There's nothing. What is your response? Because it all really boils down to this dividing line in time, according to her argument. Well, it would be nice if we had such a bold dividing line, but we don't. It's very clear that if the stop was lawful, then you look at the chronology and the reasonableness of the officer's actions and the brevity of the stop, and whether or not an officer has a right to ask for identification. Well, doesn't it really boil down to that? Because the stop was lawful, and the reason the stop was lawful was they had reasonable suspicion, or in this case, a warrant to arrest someone in the vehicle. Correct. So stop, we know, is lawful under a variety of principles. Correct. But it doesn't boil down to whether they have the right to ask him for his ID. Sure they do at that particular point, and that's what my brief addresses. It's a layered approach. What you've got is the officer's now arrested jump. If you accept Ms. McRae's analysis and say the Fourth Amendment at that point is violated if the officer asks any questions, then you kind of overlook Terry, overlook the whole reason why the officer approached and questioned the driver. Judge Beal is talking about that briefly in his questions of Ms. McRae. You've just arrested a guy who has a warrant outstanding for his arrest. He's suspected of dealing with stolen property. He has a warrant for his arrest. And you have the circumstances, which I've described for you again this morning, of a somewhat suspicious circumstance of a meeting and then their leaving. Now, he's transporting a fugitive. Everybody agrees. What's suspicious about their meeting and their leaving? Well, by a self-judgment, probably not much. Does it sound reasonable to you that if friend Jump was attempting to avoid being arrested, that he would have not only Sabbath but also Boone in the car? No. No, I'm not saying that's reasonable at all. I'm saying that what the detective's doing, he's waiting there, and he sees a fugitive come out of a home where the fugitive's not supposed to be. Judge Foote's issued a restraining order. Mr. Jump's not supposed to be there. He gets into a car. These three people obviously know each other, and they're going to go somewhere. The case law that I cite for you is very replete. An officer has every right when a lawful stop is made to ask the occupants what? Identification, where you're going, what you're going to. How do we know the detective was going to ask Mr. Sabath that, except never got a chance to, is we know he asked Ms. Boone the same question. And is that the reason for asking those questions, officer security? No. No, I think at this point the officer was asking the questions because he was suspicious, and he had a right to ask those questions. If you look at my briefcase. And that flows from the initial stop of the car in your room? Correct. The initial lawful stop of the car. Correct. See? So what you have is he arrests Jump at this point, and according to the testimony, the officer says, okay, I'm done with Jump. I'm going to go ask the driver these questions. But before I do that, I'm going to explain to him why his passenger got arrested. And the best case, which Judge Bea asked you for that proposition? Well, you can start with Bostick, and you can go through pages 21 through 22. The United States v. Diaz-Castellinga, I mispronounced it, 949 Fed 3rd, 1152. That was after the driver had been arrested. Correct. The officer wanted to know who the passenger was in the stopped vehicle. Correct. It's the other way around here. Correct. Does that make a difference? No. Berkerman v. McCartney says, typically this means an officer may ask the detainee a moderate number of questions to determine his identity and try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond, which Judge McKeon mentioned earlier when talking to Ms. McCray. I'm McKeon. That's Bea. I'm sorry. I thought it was me. The point being is that the officer had a chance to go ahead and ask the driver, one, this is why I'm taking your passenger. You say because the officer had suspicions. Suspicion of what? Well, at this particular point, as I argued in my brief, the driver is taking a fugitive somewhere. Okay. Where? That's Oregon 162.325. Correct. The hindering prosecution one. And as Ms. McCray correctly points out, I didn't present that to Judge Hogan, although Judge Hogan did deny the motion suppressed for the reasons he gave, which are similar to what I'm arguing here, which he says the person had a right to ask for the driver's identification. He also took in the brevity of the stop. This would be a much different case if the officer had not asked just for the identification or for a driver's license. I think if the officer had detained him for 20 more minutes and did a search or something else. But the logical approach here is he arrests the passenger, who has a warrant, goes to the driver, says, I've arrested your passenger for this reason. Can I have your ID? Can I have a driver's license? I think that once he says yes, well, can I have your ID, your driver's license, and once he says, I don't have a driver's license. At that point. Then he's on another ground, correct? Correct. Because presumably you need to have a driver's license to drive a car. I cite the Oregon statute. The officer testified, well, I've been on patrol. I know that if they don't have a driver's license and have an ID card, which Mr. Sabath had, then there's probably, he's driving without an operator's license, maybe even suspended. Record check is run. We all know from an earlier case out of Oregon that running a record check doesn't violate any Fourth Amendment problems. That was out of an Oregon case. The point being is that once he finds Mr. Sabath has all these outstanding warrants, the rest of it just kind of follows in order. The consent search occurs after that. The only advantage for the consent search in the governance case here is that it bolsters my argument when I say to you judges, the officer's intent to question the driver of the car, Mr. Sabath, which he never got a chance to do, was to ask the very same questions he asked of Ms. Boone. What's the nexus between the gun and the drug crime? Well, that gets back to the Hector case. I think I've got my right judge on that who authored it. The point being is, in this instance, you look to the intent. In the Mahan case that I cite, which was an offshoot of the Fongsi case that you were on, Judge Beha, talks about that I have to show the defendant's intent to connect the gun to the crime. And that was, quite frankly, the more interesting part of this trial. We have a conspiracy. We have Mr. Sabath agreeing to go buy some drugs, some dope, meth, and he has the supplier. We have three individuals. They all distrust each other for a variety of reasons, which I give you. Before he leaves his home to meet up with his two co-conspirators, he does something that his girlfriend establishes what we submit to you judges is his intent. He takes his fanny pack bag and he puts in it a loaded stolen gun with extra ammo. Now, there's no round in the chamber, but he puts it in his fanny pack. It's divided into two sections. One section has the identification. So it doesn't matter whether he distrusts the dealer or distrusts his confederates? It's a drug deal, Judge. I don't know who he distrusts at this point, but the jury went with my argument that since he made the agreement with Mr. Jump and he was waiting to get the cash from Ms. Boone and the three of them got in the car together to go to the drug site where Mr. Sabath was the person who was going to deal with the drug supplier because he was the only one that knew him and he didn't trust to tell Ms. Boone or Mr. Jump who that dealer was, fearful that they'd cut him out of his dope, that he was taking a gun to a drug deal. The jury accepted that theory and accepted it was a viable theory. And he is connected to the gun because the fanny pack had his ID in it. He picked up the fanny pack, took his ID out of it, gave it to the officer who then found the warrants. After he's arrested, his co-conspirator gives him up. She's nervous. She confesses, well, we're on our way to buy drugs. After she says a little lie, this is going for a drive. And at that particular point, we look at the totality of what gets us to where we're at. I guess the argument that I made to the jury, jury arguments are not good on appeal, but they're logical, and that is if you have three people agreeing to go rob a bank and two of them know that one of them has taken a gun to rob the bank, is the gun connected to the bank property if they're on their way to the bank to rob it? Well, I've got a gun connected to a drug deal. They're on their way to a drug deal out on River Road, which the witness said, the co-conspirator said, to do a drug deal. We know that he doesn't carry the gun with him everywhere or this fanny pack because his girlfriend said just before he left that he took the fanny pack, which he sometimes leaves home, threw it on the seat, told her he was going to go work out, exercise, and then he takes the gun with him that's behind his driver's seat. That fanny pack stays in the vehicle while the officer's got it under surveillance, and then when the three of them get together, they're all on their way to go to make the drug deal when they happen to be pulled over. They're pulled over because Mr. Jump's arrest. The detective has no idea they're on their way to a drug deal. So if you're looking at the defendant's intent, which we do under the Mahan case and the Fong C case, as well as the – I think it's – I think Hector also requires that. The judge requires in that case that we have the connections, and that's what I argued to the jury, and that's what the jury so found. Does that answer your question, Judge? Yes. Do you have any more questions? I've got a few minutes left, but I've always found it better to leave early than late. Thank you. Thank you. I never got it said about the warrant. The warrant, the arrest warrant at page 51 of the government's supplemental excerpt of record is a bit concerning in the sense that the arrest occurred on June 17, 2005, and the warrant did not become effective until May 1st of 2007, which is probably Scribner's error, but it's still a concern. Let me go back just really quickly on the hindering issue. An inchoate and unparticularized suspicion or hunch cannot withstand scrutiny under the Fourth Amendment. That's Terry at page 27. And here, there was nothing to indicate to Detective Rappe that there was any objective intent for Mr. Savath to be attempting to frustrate law enforcement or to be aiding Mr. Jump in any way. A hunch is not to withstand scrutiny under the Fourth Amendment. If we had a traffic stop here, we would have a totally different situation, but we don't. The only basis was Mr. Jump's arrest. Once that happened, Mr. Savath should have been free to go, and then the officers could have asked all the questions that they wanted, and he would have been free to choose to answer those or not. Thank you. Thank you. Thank both counsel for your argument.
judges: Hawkins, McKeown, Bea